**AFFIRM; and Opinion Filed December 10, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00235-CR

**CHRISTOPHER DANIEL DUNTSCH, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F15-00411-L**

## OPINION

Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Lang

Following a plea of not guilty, appellant Christopher Daniel Duntsch was convicted by a jury of intentionally or knowingly causing serious bodily injury to an elderly individual while using or exhibiting a deadly weapon. Punishment was assessed by the jury at life imprisonment.

In three issues on appeal, appellant contends the trial court abused its discretion by admitting certain evidence of extraneous conduct of appellant and the evidence presented at trial is insufficient to support appellant's conviction because the State failed to prove the culpable mental state beyond a reasonable doubt. We decide against appellant on his three issues. The trial court's judgment is affirmed.

# I. FACTUAL AND PROCEDURAL CONTEXT

## A. *Pretrial Proceedings*

At the time of events in question, appellant was a neurosurgeon licensed to practice medicine in Texas and Tennessee. The indictment in this case alleged that on approximately July 25, 2012, appellant "intentionally, knowingly, recklessly and with criminal negligence cause[d] serious bodily injury to MARY EFURD, an elderly individual 65 years of age or older, . . . by MALPOSITIONING AN INTERBODY DEVICE AND MALPOSITIONING PEDICLE SCREWS AND AMPUTATING THE LEFT L5 NERVE ROOT," and "use[d] a deadly weapon, to-wit: HANDS AND SURGICAL TOOLS AND A PEDICLE SCREW, during the commission of the offense." (emphasis original).

Prior to trial, the State sought a ruling on the admissibility of evidence respecting surgeries performed by appellant on patients other than the complainant. The State asserted in part,

> [T]he totality of the defendant's conduct is relevant, admissible, and crucial to the jurors' understanding of the case. This Court should admit the evidence of the defendant's other surgeries, including the outcomes of those surgeries, under the doctrine of chances and as substantive proof of the defendant's culpable mental state. . . .
>         . . . .
>         The most likely defense will be that the defendant did not act intentionally, knowingly, or recklessly. . . . In order to make a competent decision regarding the defendant's state of mind, the jurors need to understand the information that the defendant knew regarding his surgical technique and previous outcomes.

In response, appellant contended the extraneous offense evidence in question constituted improper character evidence and its admission would result in an improper amount of time "devoted to extraneous offenses and not the case itself." Further, during a pretrial hearing on that matter, counsel for appellant stated in part "[w]e would ask the [trial court] to not allow any of the extraneous offenses" the State sought to admit into evidence.

Following that pretrial hearing, the trial court ruled that it would allow the extraneous offense evidence in question and provide limiting instructions to the jury respecting that evidence.

### B. Opening Statements

During opening statements, the State asserted in part, "You're going to hear the carnage [appellant] caused was not a mistake or an accident or just malpractice . . . and he was aware of all the injuries that he had caused these patient [sic], and he knew what he was capable of, and he knew that the next patient he walked into he was going to maim or paralyze or kill."

Counsel for appellant asserted in part during opening statements as follows:

> They want to be at knowing and intentionally, and to do that they're going to bring you . . . other individuals who have had surgery with him, character evidence, other extraneouses, so that you can push yourself up that hill . . . .
> . . . .
> . . . When we're talking about surgery and we're talking about consent, there are risks in surgery. They don't want you to think that this is just one of those risks that failed, so they bring you more to persuade you it's not a risk, to persuade you that he knew, that he did it intentionally. They want to keep pushing you with the emotion and draw you away from the facts.

### C. Evidence Presented at Trial

1. Complainant's Surgery by Appellant

At trial, the complainant, Mary Efurd, testified that in 2011, she was seventy-four years old and had suffered from lower back pain for years. Her pain management doctor referred her to appellant. Efurd stated appellant recommended surgery, including a fusion of two of her vertebrae and the insertion of "hardware" in her spinal area. In December 2011, appellant performed back surgery on Efurd at Baylor Regional Medical Center of Plano ("Baylor"). Efurd testified the December 2011 surgery "went fine," but did not relieve her pain. During a follow-up appointment, appellant recommended another surgery "lower down," in the "lumbar region" of her spine.

On Wednesday, July 25, 2012, Efurd underwent a second surgery by appellant, this time at Dallas Medical Center ("DMC"). According to Efurd, when she awoke from that surgery, she

"had excruciating pain" and could not move her feet or legs or turn over in bed. She stated she was "crying and pleading and begging" for something to control the pain, but nothing she was given was effective. Efurd testified that at some point, the "administrator of the hospital" came into her room and told her appellant "wanted to do another surgery to see if he could determine what was causing all of my pain." Efurd told the administrator "something is wrong, bad wrong, and if I have to have a surgery, some type of corrective surgery, please find me another doctor."

On July 28, 2012, Efurd underwent surgery by Dr. Robert Henderson at DMC. Efurd testified that surgery "went fine," but afterward she "still was having lots of pain" and "couldn't move." Efurd was transferred to a rehabilitation facility, where she spent approximately two months. She eventually regained some muscle function in her legs and feet. However, she was left with a condition called "drop foot," which prevents her from being able to raise her left foot and requires her to wear a brace. Also, she stated she now suffers from incontinence. She testified she did not have those conditions before her second surgery by appellant.

Henderson testified he is board certified in diagnosis and treatment of the thoracic lumbar spine and has limited his surgical practice to that specialty since 1988. He stated he is "extremely familiar with orthopedic and neurosurgical techniques." According to Henderson, when he evaluated Efurd after the July 25, 2012 surgery in question, "it was very apparent that all of her current complaints were what we call iatrogenic, or caused by the surgery and by the surgeon doing the surgery." Specifically, Henderson testified in part,

> A. . . .[O]ne of my thoughts that I expressed was that [appellant] must have known what he was doing because he did virtually everything wrong. So to be able to do that much wrong, I felt that he must have known at some point in time how to do it right. It was that egregious.
>
> Q. So he knew how to do it, and he did the opposite?
>
> A. It seemed like it. In a facetious way, it seemed like it. It was—you asked how egregious it was. I'm not even—it's as egregious as you can imagine. At the end

–4–

of—well, during the procedure that I went in on Ms. Efurd to repair, I became concerned whether or not he was a physician and was a surgeon.

Q. Why?

A. Because it was such a tragedy inside what had happened. There were holes where they shouldn't be in the bone, there were holes in the dura leaking cerebral spinal fluid. There was an amputated nerve root, meaning a portion of the nerve root was just gone, and he put a screw in at the S1 level on the right side that was barely on the right side.

It actually crossed the midline and went right through the dural sac, the fluid sac that holds the nerves, and one of the implants that he was planting, that was the purpose of the operation to put between the vertebral bodies for stability and fusion, was placed to the left side of the spine.

It wasn't even in the spine. It was just laying in muscle, muscle that he had destroyed, to some extent, to make a tunnel to put the device into and had injured additional nerves.

Henderson stated he asked DMC administrators for the photograph appellant had submitted with his credentialing process. Then, Henderson faxed a copy of that photograph to Dr. Kevin Foley in Tennessee, whom appellant had listed as his fellowship director. Henderson asked Foley whether this was the person he had trained and approved as a surgeon. Foley responded "yes." Further, Henderson testified he reported appellant to the Texas Medical Board, which ultimately suspended appellant's medical license two years later.

Henderson stated that the "Hippocratic Oath" taken by all doctors upon graduation from medical school states in part, "I will not be ashamed to say I know not, nor will I fail to call in my colleagues when the skills of another are needed for a patient's recovery." Henderson testified that in this case, appellant "failed to adhere advice [sic] and interpretation of imaging from other physicians, other specialists and certainly did not call in help and certainly did not provide appropriate post operative care." Also, Henderson testified in part,

Q. . . . Would a—would a trained neurosurgeon know, when they are doing the things to Mary Efurd that [appellant] did, that they're going to cause her serious bodily injury?

A. Yes.
    . . . .

Q. Is there any way that a neurosurgeon would not know that he was causing her harm?

A. No.

Further, Henderson stated Efurd signed a consent form prior to her surgery that stated in part "there is a chance for adverse outcomes." Then, he testified as follows:

Q. So when Mary Efurd signed that consent, was she consenting to the defendant putting the interbody device into her muscle?

A. No.

Q. That's not in the realm of possibility that's being considered by this consent form that she's signing?

A. No. Not even remotely, up until now, would anyone ever have thought of that being a possible complication.
. . . .
Q. And is there any reason in Mary Efurd's case for her surgeon to have put the interbody device in her muscle the way he did?

A. No.

Q. Would you agree with me that, that is a extremely rare complication?

A. Yes.

Q. And by extremely rare, would you agree with me that that doesn't happen?

A. Yeah, I would say it would be unique, if the definition of unique is that there is only one.

Additionally, Henderson stated that at the time of the surgery in question, appellant was new to the staff of DMC and had performed only two prior surgeries at that facility. In the first of those two surgeries, the patient had been discharged to home several days later. The other prior surgery done by appellant at DMC was a cervical fusion performed on patient Floella Brown on July 24, 2012, one day before Efurd's surgery in question. According to Henderson, at the time appellant began Efurd's surgery, Brown "had yet to recover consciousness from her surgery the day before," "was doing very poorly," and "appeared to be—have had a severe brain injury."

Brown "ended up dying either that same Wednesday or Thursday." Henderson stated that in his opinion, there was "no excuse for starting or rationalization to starting an elective case, until [Brown's] condition upstairs in the ICU had been stabilized." Further, Henderson stated he is testifying in this case "for free" because "ever since I saw this what I would term as an atrocity that happened to Ms. Efurd and I found out about other issues Dr. Duntsch had been involved with, with other patients in operations that had not gone well at all, I just realized that I had to do something to stop him from taking care of patients in the future."

On cross-examination, Henderson testified in part that he gave a deposition in a civil medical malpractice lawsuit based on Efurd's surgery in question and wrote a report for Efurd's attorney in that case summarizing his observations described above. Henderson stated he was paid for writing the report for Efurd's attorney in that case.

Raji Kumar testified she was the CEO of DMC at the time of Efurd's second surgery by appellant described above. Kumar stated she received appellant's name "through somebody in town" and contacted him because "[w]e were looking for spine surgeons." She met with appellant and "was so happy to see that a surgeon was so put together and cared so much about his patients." According to Kumar, appellant told her he was leaving Baylor "due to political reasons" and "said he had one complication out of, like, so many surgeries that he had done." She testified that on approximately July 20, 2012, DMC "decided to grant him temporary privileges, as we received a clean slate from Baylor Medical Center saying that he had no issues, he had a voluntary resignation." Appellant scheduled three surgeries for his first week at DMC, including Brown and Efurd.

According to Kumar, Brown's July 24, 2012 surgery was not expected to require an overnight stay, but appellant decided "postoperatively" to admit her. At approximately 6:05 a.m. on July 25, 2012, Brown "had respiratory arrest" and was "not doing well." At 6:30 a.m., appellant

was notified that Brown was "unresponsive." Efurd's surgery began at 7:44 a.m. on that same date. Kumar stated that Efurd's surgery was elective and "was not life-threatening." Brown was transferred to another hospital at 1:25 p.m. that day.

Kumar testified that on the day after Efurd's surgery, "we had some staff that had spoken to the director of surgery, saying that they had had some concerns intraoperatively with some technique." Kumar and the director of surgery went to speak with Efurd and learned appellant had told Efurd "he needed to take her back to surgery on Monday." Kumar testified Efurd was having a hard time moving her foot. Kumar immediately talked to the chief of surgery, Dr. Robert Ippolito, and told him that "something does not seem to add up." She asked Ippolito if he "could please get involved." According to Kumar, Ippolito "looked at some images" from Efurd's case and "it seemed like the screws were in the spinal foramen, which means they were actually inside the— kind of touching the spinal cord." Kumar contacted appellant. He told her "everything is fine" and stated that Efurd needed another surgery because she had a "re-ruptured disc" and a compressed nerve, which appellant told her "happens about 1/20 cases." Kumar testified Efurd "did not happen to be doing fine." Additionally, Kumar stated that the anesthesiologist from Efurd's July 25, 2012 surgery wrote in his notes (1) the "interbody cage" device that appellant put in was "likely in the wrong place"; (2) appellant "did a very poor job" of controlling blood loss, "often ignoring the pool of blood that was forming and just continuing to stab the patient"; and (3) "[appellant] kept saying he had to hurry so as to take care of the patient upstairs but really he needed to focus on this case."

Kyle Kissenger testified he is a nurse and has participated in at least several hundred spine surgeries. He participated in Efurd's July 25, 2012 surgery by appellant at DMC. According to Kissenger, Efurd's surgery started at least a half-hour late and appellant was "agitated already" because of "what was going on upstairs with the other patient." Kissenger stated that during

Efurd's surgery, Ippolito came into the operating room and told appellant "in not too kind of words" that appellant's request to do an emergency "craniotomy" on Brown had been denied by DMC and Brown was being transferred to another hospital. According to Kissenger, at that point, appellant and Ippolito got into a short "argument." Kissenger stated appellant "was still very agitated about the whole thing." Then, appellant "broke scrub" and "left the room" for at least thirty minutes, which is "very rare."

Kissenger stated that prior to appellant leaving the operating room, appellant had been trying to "place a pedicle screw" to attach a device to Efurd's spine and "[a]ll of us in the room" were telling him the screw was "not in the right place." Upon returning to the operating room, appellant took that screw out and "started going back to trying to get it in the right place." Further, Kissenger testified the placement of the device "never looked right" to him during the surgery and "everyone" told appellant "that's not right." Kissenger stated that after surgery, he was told Efurd was unable to move her leg. He testified that something like that "should never happen" in an elective spine surgery and he had never had anything like that happen to a patient of his before.

Danny Smith testified he has been a surgical assistant for twenty-two years. On July 25, 2012, he was the spine coordinator at DMC. He had met appellant for the first time on the previous day and had performed one surgery with him. Smith stated that during Efurd's surgery, "there was some question" about the positioning of a screw and "everybody" told appellant "it was lateral of where it needed to be." Also, Smith testified that during the surgery, appellant stated he "wanted to stop [Efurd's] surgery" at "whatever point we were at," "close her up," and "go take care of the patient upstairs." According to Smith, the anesthesiologist then told appellant "he needed to focus on this patient."

On cross-examination, Smith testified that when Ippolito came into the operating room, appellant and Ippolito had a "tense conversation," during which appellant continued actively

working on Efurd. Additionally, Smith stated (1) appellant is "a smart guy," but "his technique may not be the best," and (2) "whenever [appellant] tried to help a patient," "[appellant] believed that he could."

On redirect examination, Smith testified in part as follows:

Q. And if you are in the middle of a procedure, and you find yourself distracted, what should you do?

A. You can tell 'em "we'll talk later." . . . You don't have to have a conversation right there, over an open patient. That was the choice made by the surgeon.

Q. Because, if you're going to be distracted, you may do something wrong.

A. Yes, ma'am.

Q. And, you know that.

A. Yes, ma'am.

Matt Padron testified that on July 25, 2012, he was a "device representative" for Lanx Spine and was present at Efurd's surgery. He stated his role was to ensure that the surgeon had the proper implants and hardware during surgery. According to Padron, the surgery was "[c]haos, from the beginning." He stated it was his first case with appellant and "the OR staff didn't know what we were doing, as far as how to set up the room, getting the sets [of hardware] there." After the operation began, "somebody came in talking about doing a cranial case" and appellant "broke scrub" and "left to talk to somebody." Padron stated that before appellant left the room, he directed the "OR techs" to "search around" in Efurd's body for a pedicle screw that the x-ray images showed was misplaced. According to Padron, "that's kind of when we knew things were going downhill."

Padron stated that after appellant returned, he seemed to be "growing in agitation." Further, according to Padron, "some time around the time we were putting the cage in," a man came into the room and appellant began arguing with him. Padron testified the x-ray imaging showed the

–10–

interbody cage was improperly placed in "soft tissue" rather than bone and Padron told appellant that. According to Padron, appellant responded that he had "direct visualization" that it was in bone. Padron stated it was "very clear in the surgery" that "something was wrong" with the placement of the cage and appellant was told that "by multiple people."

Anam Hussain testified he is a surgical technician and participated in Efurd's July 25, 2012 surgery. He stated that during the surgery, appellant received a call about "a patient upstairs" who had "some sort of complication." According to Hussain, "[a]fter that, [appellant] kind of lost a little bit of focus," "seemed distracted," and "was more concerned about . . . what was going on with the other patient." Additionally, Hussain stated that during the surgery, one of the pedicle screws was misplaced into "soft tissue" rather than bone and "there was a lot of bleeding."

Elaine Furey testified she has been an x-ray technician for twenty years. She stated she was present at Efurd's July 25, 2012 surgery, which "didn't go smoothly." During that surgery, Furey provided x-ray images using fluoroscopy, which allows for continuous viewing of a live x-ray image on a monitor during surgery. She stated that based on those images, she told appellant, "I don't think the cage is in the right area." Also, Furey stated that "one of the reps said it wasn't in the right place." According to Furey, appellant responded, "I've done a [expletive] visual. I can see where it is. You don't have to tell me." She stated appellant was acting "very erratic" and "angry." Further, she testified she has done at least 100 spine surgeries and has never "seen a cage in between the vertebrae like that."

Dr. Martin Lazar testified he is board certified in neurological surgery and has been a practicing neurosurgeon for forty years. He has performed "many thousands" of surgeries. At the request of two plaintiffs' attorneys, he reviewed the cases of several of appellant's patients for purposes of civil litigation, for which he was paid. He stated he was not paid for his testimony in this case.

Lazar testified that appellant's July 25, 2012 surgery on Efurd went "[p]oorly, to say the least" and resulted in "a catastrophic surgical misadventure." According to Lazar, (1) a prosthetic device was misplaced, resulting in damage to muscle tissue, and (2) a surgical tool amputated a major nerve root and a screw damaged other nerve roots, causing permanent partial leg paralysis and other impairment in the lower extremities. Further, Lazar testified in part,

Q. Have you ever seen anything like what happened in Ms. Efurd's surgery?

A. Never.
. . . .
Q. How egregious would you say it is?

A. It's beyond egregious. It's beyond anybody's imagination that this could happen.

Q. Is this a normal risk of surgery?

A. No.

Q. Is this something Ms. Efurd would have consented to, when she signed all those forms?

A. Never.
. . . .
Q. Is there any way that a neurosurgeon doesn't know that he's going to cause Ms. Efurd serious bodily injury by doing these things?

A. It's inconceivable. How can you not know that you're going to cause the disaster? Intraoperative x-rays were taken, and you can see on the intraoperative x-ray where things are.

Q. And did you see those intraoperative x-rays?

A. Yes.

Q. Is it pretty clear where things are?

A. Yes.

Ippolito testified appellant's surgical privileges at DMC were revoked on July 27, 2012, based on "the two patients that had been operated at our facility," Brown and Efurd. He stated

those were "[v]ery serious, negative outcomes" and he has never "seen anything like that" in his forty-one years as a surgeon.

Dr. Carlos Bagley testified as an expert for the defense. He stated he is a neurosurgeon and has performed approximately 4,300 spine surgeries. According to Bagley, appellant's errors were "known complications" that "a poorly-trained, inexperienced surgeon could do" and have "all occurred before elsewhere and been reported in the literature." Additionally, Bagley testified (1) "if a doctor's desire is to hurt a patient, he could do so in a more less obvious way than performing bad surgeries"; (2) if a doctor "tries to fix a surgery that he's previously done," that "can be" a sign that the doctor is "concerned about his patients"; and (3) if a particular surgeon is "inexperienced and poorly trained," a "chaotic operating room" is "an additional barrier to providing appropriate care."

## 2. Extraneous Acts of Appellant

Additionally, over objection by appellant, the State presented the following evidence respecting extraneous acts of appellant.[1] Throughout the trial, the jury was repeatedly instructed that such evidence was to be considered "only . . . in determining the intent, knowledge, motive, absence of mistake or lack of action of the defendant, if any, alleged in the indictment in this case and for no other purpose."

### a. Robert Passmore

Robert Passmore testified he is forty-one years old. In late 2011, he was experiencing back pain and was referred to appellant, who recommended surgery. On December 30, 2011, appellant performed back surgery on Passmore at Baylor. That surgery included an "interbody fusion" and placement of a spacing device between two of Passmore's vertebrae. When Passmore awoke from

---

[1] Also, during the testimony of the witnesses described below, related medical records, reports, and other exhibits were admitted into evidence over appellant's objection.

the surgery, he "hurt extremely." On January 6, 2012, he underwent a second surgery by appellant that was not "part of the plan." The purpose of the second surgery was to reduce pressure on his spine and remove "pieces of disc" from the area that was originally operated on. Passmore stated that after the second surgery, he was not better than before the surgeries and he stopped seeing appellant. He still experiences back pain. Also, he stated he now has a limp, nerve pain, numbness, poor balance, "bowel problems," incontinence, and erectile dysfunction that he did not have prior to his surgeries. On cross-examination, Passmore testified in part that prior to his surgeries by appellant, he signed a consent form that stated "the practice of medicine in surgery is not an exact science."

Passmore's mother, Janet Elaine Passmore, testified she accompanied Passmore to appellant's office several days after Passmore's first surgery and was present when Passmore described to appellant that he was experiencing pain in areas of his back that had not previously hurt. Janet stated appellant told Passmore, "You're not giving the medication time to do its work." According to Janet, as soon as she and Passmore returned home from that office visit, Passmore received a phone call from appellant in which appellant stated there was "something wrong" and "it has to be taken care of immediately." Passmore then underwent a second surgery by appellant, but his condition did not improve.

Dr. Mark Hoyle testified he is a vascular surgeon and his practice consists mainly of "spinal exposures." He has been practicing in that field since 1994. On December 30, 2011, he was scheduled to "do the opening" for appellant's surgery on Passmore. Hoyle had not met appellant before that date. Hoyle testified that in the doctors' lounge before the surgery, appellant stated he is "the best-trained surgeon there is" and seemed "pretty over-confident or narcissistic." Hoyle made the initial incision and then called appellant into the operating room. According to Hoyle, appellant's surgical technique was "sloppy" and resulted in "a lot of bleeding." At one point, Hoyle

physically stopped the surgery and stated to appellant, "You can't see what you're doing, and you're right on top of the spinal cord and you're gonna hurt this guy, if you don't let me get control of the bleeding." According to Hoyle, appellant did not "seem appropriately concerned about that." Hoyle "got a little upset" and told appellant "he was incredibly dangerous" and Hoyle "was never working with him again" because "[h]e was going to hurt somebody." Hoyle stated he had "never done that with anybody before." Additionally, Hoyle was concerned about the placement of the "cage" device being inserted by appellant. Specifically, according to Hoyle,

> I told [appellant], "It's too far to my side. It's too far to the left." I said, "You need to get an x-ray because, I'm telling you, you're too far to my side." He said, "No, I think it's fine." I said, "Let's get an x-ray. I'm telling you, you're too far over to my side." He says, "No, I'm fine." He proceeded to put the four screws in. . . .
>     Once we got an x-ray, lo and behold, it was too far to my side, just like I said. He said, "You were right. I should've got an x-ray."

Hoyle had three other surgeries scheduled with appellant, but cancelled them at that point.

### b. Barry Morguloff

Barry Morguloff testified that in 2011 he had a "history of back issues" and was referred to appellant. On January 11, 2012, appellant performed back surgery on Morguloff at Baylor. The surgery included a fusion and the installation of "titanium hardware." Prior to the surgery, Morguloff had "complete mobility," but was experiencing back pain in connection with certain activities. Morguloff signed a consent form and "knew basically there could be complications."

Morguloff stated that as he regained consciousness after surgery, he had numbness and "an incredible amount of pain" in his left leg, which worsened over the next few days. He testified he told appellant about that pain and numbness. Appellant told him it would go away over time, but it actually became worse and Morguloff lost the ability to move his left foot properly. Morguloff stated he eventually sought the opinion of another neurosurgeon, Dr. Michael Desaloms, who told him "the hardware was loose" and bone fragments had "lodged into" the nerve canal and were "impinging the nerve." Morguloff underwent a subsequent surgery by Desaloms and his condition

–15–

improved slightly, but much of the nerve damage was permanent. He still experiences pain in his leg and cannot walk without a brace and cane.

Dr. Randall Kirby testified he has been a vascular surgeon since 1996 and his area of expertise is "spinal access." He stated he was present during Morguloff's January 11, 2012 surgery because the general surgeon hired by appellant to assist in the operating room asked Kirby to "help" with the case. According to Kirby, although the type of surgery Morguloff was to undergo "is about the easiest operation a spine surgeon performs," appellant "struggled mightily" and "was functioning at the level of a first- or second-year neurosurgery resident."

c. Jerry Summers

Jerry Summers testified by video deposition that he is forty-six years old and has known appellant since they attended junior high school together in Tennessee. In approximately 2011, Summers moved to Dallas with appellant to assist in "opening up a new clinic." At that time, Summers was experiencing "sharp pain" and some numbness in his arms and hands. Appellant offered to perform a "disc fusion surgery" on Summers's spine. Appellant told Summers it was "a very dangerous surgery" and went over "the risks" with Summers several times.

Appellant performed surgery on Summers at Baylor on February 2, 2012. When Summers awoke from the surgery, he couldn't move his arms or legs and "freaked out." He did not regain movement in his arms and legs and now has a permanent condition in his limbs called "incomplete paralysis." He can feel "touching" and pain, but his arms and legs are otherwise paralyzed. He is confined to a wheelchair and requires a catheter. Also, as a result of his condition, he is prone to lung infections and battles bedsores, digestive issues, and depression.

Dr. Joy Gathe-Ghermay testified she has been practicing as an anesthesiologist for approximately twenty years. She was the anesthesiologist during Summers's surgery described above. Gathe-Ghermay stated that when the surgery began, she positioned herself "at the head of

the bed," which is typical. However, during the surgery, she noticed that there "seemed to be a lot of blood being suctioned from the patient" and she then moved to the foot of the operating table so she could "better see the surgeon and the suctioning equipment." She stated that the typical amount of blood loss for that type of surgery is "150 to 200 cc's." When the blood loss reached 800 cc, Gathe-Ghermay asked appellant, "Is everything okay?" She stated that his response was "yes." The final amount of blood loss during the surgery was 1,900 cc.

Gathe-Ghermay testified that after Summers was moved to the recovery room, a neurological evaluation showed "weakness in his arms and legs." She "started to have concerns about his condition" and asked the nurses to contact appellant. She had another surgery scheduled with appellant later that day, but arranged for a substitute to handle that surgery because she was concerned Summers "could potentially have respiratory compromise" and require further treatment by her. Gathe-Ghermay stated she has been assisting with spine surgeries for seventeen years and has never seen anyone become a quadriplegic from the type of surgery Summers had.

Laura Strasser testified she has been a nurse for more than thirty years. She assisted as a surgical nurse in Summers's surgery described above. According to Strasser, during the surgery, the anesthesiologist "was concerned about the blood loss that was occurring" and asked appellant several times whether everything was okay. After the surgery, Strasser accompanied Summers to the recovery room. She stated the recovery room nurses became concerned because Summers could not move his arms or legs and "[t]he urine catheter bag was full of—bright cherry red" rather than "normal yellow." Strasser stated she was "numb and in shock" because she had "never had an outcome like that before."

Marcia Adlam testified she has been an operating room nurse since 1993. At approximately 11 p.m. on February 2, 2012, she was on call and was asked to assist in an emergency "bring back" surgery on a patient who had undergone surgery earlier that day. The patient was Summers, who

had paralysis and was unable to move his arms and legs. The surgeon was appellant. Adlam stated appellant was calm, but it "seemed he was hurrying through the operation." She stated she saw appellant remove material from Summers that appeared to be muscle tissue mixed with "surgical foam," which is a hemostatic product that "looks like a sponge" and is used to control bleeding.

Debra Gunaca testified she is a "circular" at Baylor and "runs[s] the operating room" during surgeries. She has been "working in surgery" for approximately twenty years. In 2012, she was present during a "revision surgery" on Summers that occurred subsequent to Summers's two surgeries by appellant described above. The surgeon was Dr. O'Brien. Gunaca testified that when O'Brien "got down to the area in question that he was going to stabilize," he stated, "Holy [expletive]. What the [expletive] did that guy do?" Gunaca stated the comment surprised her because she had operated with O'Brien numerous times before and he was "not normally like that."

As stated above, Dr. Martin Lazar testified he reviewed certain spinal cases, including Summers's case, at the request of several plaintiffs' attorneys. Lazar stated appellant correctly diagnosed Summers with a severe spinal cord compression. However, according to Lazar, during Summers's surgery there was "massive" blood loss due to a damaged artery. Specifically, Lazar testified appellant "took out an excessive amount of vertebral bone" and "exposed the vertebral artery to injury." He stated that injury to a vertebral artery is a "known complication" of spine surgery, but is "exceptionally rare." Further, Lazar testified (1) he believed Summers's quadriplegia was caused by pressure on the spinal cord and nerve root that resulted when appellant "pack[ed] excessive amounts of Gelfoam or some other thrombogenic or hemostatic agent into the spinal canal" in an attempt to reduce the massive bleeding and (2) that did not constitute "reasonable medical care." Additionally, Lazar stated (1) in the second surgery on Summers, appellant attempted to relieve pressure on the back of the spinal cord, but "the pressure was really

in the front," and (2) by removing bone in Summers's back during the second surgery, appellant caused additional "instability" issues respecting Summers's spine and neck.

Dr. Joseph Sample testified he is currently retired after practicing medicine for more than forty years. At the time of the events described above, he was chairman of the physician peer review committee at Baylor, which is made up of six to eight physicians. Sample stated that "pretty much right after [Summers's] surgery," he received a report from an ICU nurse that Summers said he and his surgeon, appellant, had "consumed a combination of cocaine and heroin." The committee referred appellant to the hospital's physician health and wellness program for evaluation for drug abuse and asked appellant "to refrain from scheduling any further surgical cases for the next two weeks." According to Sample, "[t]he Committee's feeling was that the patient had an unexpected outcome from the surgery; that the surgeon failed to recognize the complications; that the surgeon may have performed an inadequate second surgical procedure." Also, the committee was concerned about "an unacceptable relationship that developed between the patient, the patient's family and the operating surgeon." Sample testified appellant's drug test "came back negative for drugs." However, appellant was asked to relinquish care of Summers to another physician, which Sample testified happens only "rarely." Sample testified that approximately three weeks later, appellant "requested a return to surgical privileges." Although an "external review" of Summers's surgery was still pending, appellant's request was granted. According to Sample, appellant was asked by the committee "to not schedule anything but minor surgical procedures" and appellant agreed to that request. Sample testified that the "very next" surgery appellant performed was on a patient named Kellie Martin.

### d. Kellie Martin

Don Martin testified that on March 12, 2012, appellant operated on his wife, Kellie Martin ("Martin"), who was fifty-five years old at that time. The surgery took place at Baylor. After

–19–

surgery, appellant told Don Martin there were "some complications" and his wife was being taken to the intensive care unit, but she would "be okay." Several hours later, appellant and two other doctors came out to the waiting area and told Don Martin that his wife had passed away.

Julie Hogg testified she is an operating room nurse at Baylor and has been "doing surgery" for approximately twenty years. She was present at Martin's surgery described above. She stated that near the end of the surgery, the anesthesiologist was concerned because "the patient's blood pressure was going down and there wasn't any way to get it back up." At that point, appellant left the room to go talk to the family. While appellant was out of the room, Hogg and others "flipped" Martin over onto her back pursuant to a request from the anesthesiologist. According to Hogg, Martin "was starting to wake up and kind of writhing in pain and reaching for her legs." Hogg testified Martin's legs were "very mottled" and had "white and red splotchy spots all over," which "usually is an indication of lack of blood flow, oxygenation, into the extremities." Hogg pointed this out to the anesthesiologist, who stated, "Yes, something's wrong. I cannot get her blood pressure up." When appellant returned to the room, he was "made aware of the patient's condition." Also, Hogg told him about the patient's mottled legs. Appellant "acted very nonchalant" and stated, "She's fine. She's fine." Hogg and another nurse rushed to get Martin's bed to the intensive care unit and "handed off care to the ICU team."

James Cooper testified he is a radiology technician and participated in Martin's surgery described above. Cooper stated that during the surgery, the anesthesiologist had "concerns about the blood pressure" and "asked also if there was any—if the physician had seen any additional blood or if they were, you know, bleeding additionally." According to Cooper, appellant's response was "along the lines of, 'Well, we got it. We see a little bit. We got it.'" Cooper stated that appellant's "PA," Kimberly Morgan, was also present during that surgery. According to Cooper, the relationship between appellant and Morgan was "flirtatious." Further, Cooper testified,

"[A]fter the concern about the blood pressures, [Morgan] had mentioned that, 'Oh, you wouldn't mess up.' [Appellant] said, 'No, that's right. It's because I'm god.'"

Udina Doucet testified she is an operating room nurse and was present during Martin's surgery. Doucet stated that during the surgery, the anesthesiologist became "very concerned" about Martin's "vitals" and told appellant, "You need to close her. We need to get her off this bed." Doucet testified appellant responded, "She's fine. Everything is fine."

Dr. Jeff Taylor testified he is a pulmonary critical care physician and has worked at Baylor for twelve years. He stated he treated Martin in the Baylor ICU following the surgery described above. According to Taylor, when Martin arrived in the ICU, her legs were "mottled" and she had no movement in one leg. Taylor testified her symptoms were suggestive of "inadequate circulation." He began a rapid transfusion of blood, but her condition deteriorated. Taylor determined Martin was experiencing internal bleeding, but he could not determine where the blood loss was originating. He and the anesthesiologist spent approximately two hours trying to resuscitate Martin, but were not successful. Taylor testified that in his twelve years at Baylor ICU, he has never "seen someone who was getting an elected spine surgery come into the ICU in this condition."

William Rohr testified he is the medical examiner for Collin County, Texas. His job "involves doing autopsies and examinations of deceased individuals, to determine cause and manner of death." In March 2012, he conducted an autopsy on Martin. He testified appellant had communicated to him that "the surgery went well," with a "normal" amount of external blood loss. Rohr stated he "opened up the abdomen" and it "was full of blood," which "was obviously going to be the cause of death and somehow related to the cause of death." Rohr was unable to locate or determine damage to a particular blood vessel. He stated he believed "the blood loss did start up during the surgery" and "this was a result of something that didn't go right during the procedure."

Rohr ruled Martin's death to be accidental and "most likely the result of a therapeutic misadventure." According to Rohr, appellant requested and was sent a copy of the autopsy report.

Lazar testified appellant properly diagnosed Martin with a herniated disc. He stated the planned surgery is "the most common spine operation done," has a mortality rate of less than one in 10,000, and was a reasonable treatment for Martin's symptoms. According to Lazar, Martin died from a "retroperitoneal hemorrhage." Specifically, Lazar testified a surgical instrument called a disc rongeur "went through the ligament in the front" and lacerated an "iliac vessel," which resulted in internal bleeding. Further, Lazar stated that a trained neurosurgeon would know (1) this is "a rare but possible complication of this type of surgery" that needs to be addressed immediately during the surgery and (2) the most common cause of blood pressure dropping during surgery is hemorrhage.

Sample testified that on the morning after Martin's death, her case came to the attention of the Baylor physician peer review committee. Sample elected to take the case directly to the Medical Staff Executive Committee in order to accelerate the review process. The executive committee determined Martin had bled to death from a "penetrating wound." Further, the committee (1) determined appellant was at fault as to both Martin's death and Summers's condition and (2) recommended that the incidents be reported to the Texas Medical Board. Sample testified appellant was informed of the committee's findings and Sample personally told appellant that he "had grave concerns about [appellant's] operative technique and judgment." Appellant again took a "leave of absence" and was asked to submit to drug testing. Appellant's initial drug test results came back as "diluted," so he was asked to repeat the test several days later. His second drug test came back negative. Approximately one month after Martin's death, appellant requested reinstatement of his surgical privileges at Baylor, but that request was denied. Appellant was told

he would not be allowed to operate at Baylor again. According to Sample, appellant resigned his privileges at Baylor on April 20, 2012. Further, Sample testified as follows:

Q. . . . Have you ever seen anything like these two cases before, in your career?

A. No.

Q. And how long have you been doing this?

A. Forty-five years.

Q. And what makes them so different?

A. A failure to recognize the consequences of the surgery. Accidents happen in surgery. Every surgical procedure has got a mortality rate associated with it. But there were two events too close together that were very disturbing.

Q. And you've never seen anything like that before?

A. No.

On cross-examination, Sample testified (1) appellant voluntarily resigned from Baylor; (2) Baylor "did not take his privileges away"; and (3) upon his resignation, appellant received "a letter from Baylor that did not indicate he had any problems." On redirect examination, Sample testified that in response to a subsequent request by DMC for information respecting appellant, Baylor sent DMC an August 31, 2012 letter in which it stated in part that the Baylor executive committee determined that the "standard of care" was not met in the cases of Summers and Martin.

### e. Floella Brown

Joe Brown testified that his wife, Floella Brown ("Brown"), underwent surgery by appellant for neck pain at DMC on July 24, 2012, and passed away as a result of that surgery. Joe Brown stated that when he arrived at the hospital to visit his wife at approximately 5:30 a.m. on July 25, 2012, she was "convulsing in the bed." The staff on duty called appellant, who arrived approximately one hour later. Joe Brown testified appellant "looked at [Brown] and he said, 'I've got to drill a hole in her head and relieve the pressure on the brain.'" However, according to Joe

Brown, "the hospital did not allow that to happen, because he was not qualified to do that." Several hours later, Brown was transferred to another hospital. The staff at that facility told Joe Brown his wife was "brain dead." She was removed from life support a short time later.

Lazar testified he reviewed Brown's case. He stated that based on Brown's symptoms, appellant was operating "at the completely wrong level" of her spine. Also, according to Lazar, Brown "lost 20 percent of her blood volume" during surgery, which is "an enormous blood loss." Specifically, he stated that although a normal blood loss for that type of surgery is 25 cc to 200 cc, Brown lost approximately "1,200, at least." Additionally, Lazar testified (1) "we know in this case that [appellant] took too much bone off again and exposed the vertebral artery"; (2) either "the artery itself was lacerated" or "the bleeding came from the periarterial venous plexus," or both; (3) then, "[s]omething [appellant] did obstructed the vertebral artery"; (4) "[p]robably, because it was bleeding, he packed it"; (5) that "would stop the blood from coming out into the wound," but "it could also stop the vessel from working so that the blood wasn't going to the brain"; (6) "[i]f you have an occluded vessel and you have decreased oxygen-carrying capacity and that vessel is the dominant vessel going to the back of your brain, you're gonna have a stroke"; and (7) Brown experienced obstruction to her dominant vertebral artery, which resulted in a stroke, brain swelling, and, ultimately, acute obstructive hydrocephalus, which caused her death.

Further, Lazar stated in part,

Q. Is this a normal risk of surgery?

A. No, this is not a normal risk.

Q. Is it a risk at all?

A. It's a risk, but it has to be so far outside of statistical probability that one would not mention it.

. . . .

Q. So, it's pretty rare?

A. It's very rare.

. . . .

Q. If you have all of those outcomes [described above], would you go into another surgery?

A. Never.

Q. Would you know that you are going to hurt that next patient?

A. How can you not?

Bagley testified in part on direct examination,

Q. Do you think Dr. Duntsch was poorly-trained, based on your review of these surgeries?

A. Well, I would say—again, I don't know what the denominator is, how many cases this was out of. But, for the number of catastrophic injuries that occurred over a very short period of time, it would be hard-pressed to imagine that those qualities didn't show themselves during training.

Further, Bagley testified on cross-examination that the six surgeries described above "would be considered low risk surgeries." Additionally, Bagley stated as follows:

Q. And [appellant] had a high rate of patients coming back after their surgeries complaining of new neurological problems.

A. Again, the rate, I can't say because I only reviewed specific records. But that was a lot of patients, for the time. But I don't know what the denominator is. I don't know how many patients it's out of.
. . . .
Q. . . . [Y]ou said earlier that you have heard of all these complications [described above]; that they're known complications, but they're extremely rare.

A. Yes, ma'am.

Q. These things don't just happen all the time, on a regular basis.

A. Yes, ma'am.

Q. So it's highly unusual that a surgeon would have all of these extremely-rare complications in a very short period of time. Wouldn't you agree?

A. Extremely. Yes, ma'am.

Q. And even a surgeon who wants to say they're poorly trained, when they—when a patient is complaining of new pain over and over and over again, multiple patients, you start to know that you're hurting people.

–25–

A. I would hope so. Yes, ma'am.

#### f. Barbara Jean Ellison

Barbara Jean Ellison testified she has been an office manager and "medical office biller" for twenty-five years. She worked for appellant from December 2011 to July 2012. She stated appellant "lost privileges" from approximately March 2012 until July 2012 and did not perform surgeries during that time. Ellison overheard appellant telling patients "he was going to be the medical director of a billion-dollar facility," "he was the best that ever came out of Tennessee's program," and "[n]obody else could do what he could do, as well as he could do it." In Ellison's opinion, those statements were lies. She stated appellant (1) seemed depressed, (2) had only a few patients, (3) was rejected by at least one hospital to which he applied for privileges, and (4) would sometimes "just disappear" with "no communication from him for days at a time." Further, Ellison testified it seemed to her that "[appellant] had an unusual number of bad outcomes" as compared to the other doctors she had worked for.

Ellison testified that after Brown's surgery, appellant asked her to "change the record" respecting "the date that [Brown] was told to be off of blood thinners." Specifically, Ellison stated appellant wanted the office records to reflect that Brown had been told to stay off of blood thinners for fourteen days before her surgery, when Brown had actually been off of blood thinners for only four days before her surgery. Ellison testified she did not change the paperwork as requested by appellant, but later saw "an addendum there in [appellant's] handwriting."

#### g. Kimberly Morgan

Morgan testified via Skype that from August 2011 until approximately May 2012, she was employed as a nurse practitioner, surgical assistant, and office administrator in appellant's office. She stated she participated in ten to twenty neurosurgeries with appellant during that time.

According to Morgan, appellant was "very caring and kind" when she began working for him, but his demeanor later changed and he became "angry-appearing" and "confrontational."

Additionally, Morgan stated she had an intimate personal relationship with appellant during a portion of the time period that she worked for him. They often communicated through emails. Morgan testified she received a December 9, 2011 email from appellant titled "Occam's Razor." That email was admitted into evidence as State's Exhibit 160 and published to the jury.[2] Morgan stated (1) she has "no clue" what appellant meant in his statements in that email and (2) the email did not cause her to "think [appellant] wanted to go and kill people."

### D. Closing Argument and Jury Charge

During closing argument, the prosecution stated in part,

Well, that email, number one, tells you everything you need to know about what's in [appellant's] head. . . .

. . . .

But, he's god. He's Einstein. He's the antichrist. Those are his words, right? . . .

. . . .

So now, we've got all of these people. All of these people that he hurt, over and over and over again. How many does it take . . . before you know what you're doing is hurting people, causing that serious bodily injury? How many lives does it take?

. . . .

---

[2] That email stated in part as follows:

Unfortunately, you cannot understand that I really am building an empire, and I am so far outside the box that the earth is small and the sun is bright. . . .

. . . .

Anyone close to me thinks that I'm likely something between god, einstein, and the antichrist. Because how can I do anything I want and cross any discipline boundary like its [sic] a playground and never ever lose. But unfortunately, despite the fact that I'm winning it is not happening fast enough. What is the problem Kim? It is simply that everyone else is human and there is nothing I can do about it. And so I pick and choose my humans and try to help them. . . .

. . . .

You, my child, are the only one between me and the other side. I am ready to leave the love and kindness and goodness and patience that I mix with everything else that I am and become a cold blooded killer. The sad fact is that I would go faster do better and catch more respect and honor by [expletive] every one in the brain, emotionally and mentally control them in a manner that borders on abuse, taking no prisoners, and sending everyone in my way, and especially that [expletive] with me to hell for the simple fact that they thought they could much less tried. [sic]

. . . .

What I am being is what I am, one of a kind, a mother [expletive] stone cold killer that can buy or own or steal or ruin or build whatever he wants.

You have to go in now and tell him "no more." . . . His own words, he was being what he was: a one-of-a-kind, mother-[expletive], stone-cold killer. You say "no." . . .

. . . .

. . . The Judge allowed you to hear about these other patients, because it goes to knowledge. That is why you even got those. Normally, you don't get to hear about those other sort of things. It's not to garner sympathy. It is that [sic] you can know everything that the Defendant knew.

. . . .

So, let's talk about knowing. Absolutely. I want you to find that he intentionally, knowingly, did this. We have filled you a room full of knowledge. Knowledge of all the pain that the patients were suffering, as they came out of the surgeries, that he was causing. . . . Knowledge—every witness who came in here told you and gave you a different piece of everything that the Defendant knew, before he went into [Efurd's] surgery and even while he's in there.

Counsel for appellant argued in part,

Dr. Bagley sat up here . . . and told you, "Yes, not one of these surgeries was reasonable medical care." So there's no defense to reasonable medical care. "Yes, they were suboptimal surgeries. They were not good surgeries. They were bad outcomes." Okay. Everybody agrees that they were bad outcomes.

. . . .

They want to make him a stone-cold killer and monster, because that's what he said in an email, to a girlfriend, who thought he was rambling, just like he always does. But you've got to stand there and think, is that, does that, in and of itself, rise to the level of . . . intentional and knowingly?

. . . .

[D]o you need all this [extraneous evidence]? Because, see, the fear the State has is that if you look at the situation by itself, you might accidentally—think it's an accident. Think it's all the distractions that caused it. So they want to make sure you had all this [extraneous evidence] to help you with intent. Do you know what? You can have all this, because he's got that in his head. And maybe it helps you put yourself where he is. But maybe where he is at that point in time is not what they want to say. Because, . . . they started this whole thing out in opening statements they were going to prove to you intentionally and knowingly . . . . Ladies and Gentlemen, just because that's what you think he deserves doesn't mean necessarily that's what the evidence fits.

. . . .

The problem was, he . . . was not a skilled surgeon. He was, according to his peers, at the level of a first-year resident. But he was on his own, and doing the best he could. . . .

. . . .

[Appellant] never could get his hands to do what he knew he was supposed to do, and it caused injury.

I think he knows that that caused the injury. . . . But, was he going in hoping that he would do it again; that he would cause injury again? No. . . . I think his hope

–28–

was, this time, he would learn from what he did before and it would be better. And it never did.

The charge of the court instructed the jury that "if there is any evidence before you in this case regarding the defendant's having engaged in conduct or acts other than the offense alleged against him in the indictment in this case," "you may only consider the same in determining the intent or knowledge of the defendant, if any, or the absence of mistake or accident, if any, in connection with the offense alleged against the defendant in the indictment, and for no other purpose." Following the verdict and assessment of punishment described above, this appeal was timely filed.

## II. APPELLANT'S ISSUES

### A. Standard of Review

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). The trial court abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Id*. at 83. We uphold a trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (review of "all of the evidence" includes evidence that was properly and improperly admitted). "Appellate review 'does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Johnson v. State*, No. PD-0197-17, 2018 WL 5810857, at *1 (Tex. Crim. App. Nov. 7, 2018) (quoting *Musacchio v. United States*,

136 S. Ct. 709, 715 (2016)); *accord Zuniga*, 551 S.W.3d at 732; *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("inference" is conclusion reached by considering other facts and deducing logical consequence from them). "We may not re-weigh the evidence or substitute our judgment for that of the fact-finder." *Zuniga*, 551 S.W.3d at 732. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Id*. at 733. We presume that the fact-finder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Id*.; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In analyzing the sufficiency of the evidence, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. Further, "[d]irect evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Zuniga*, 551 S.W.3d at 733.

### B. Applicable Law

Texas Penal Code section 22.04 provides in part that a person commits the offense of injury to an elderly individual if he intentionally or knowingly causes serious bodily injury to a person sixty-five years of age or older. TEX. PENAL CODE ANN. § 22.04(a). A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(a)(46).

Injury to an elderly individual is a "result of conduct" offense, which means the culpable mental state relates to the result of the conduct, i.e., the causing of the injury. *Kelly v. State*, 748

S.W.2d 236, 239 (Tex. Crim. App. 1988); *Perkins v. State*, No. 05-17-00288-CR, 2018 WL 2252420, at \*3 (Tex. App.—Dallas May 17, 2018, pet. ref'd) (mem. op., not designated for publication). Proof of mental state will almost always depend upon circumstantial evidence. *Lincoln v. State*, 307 S.W.3d 921, 924 (Tex. App.—Dallas 2010, no pet.). Knowledge may be inferred from the person's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd).

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. TEX. R. EVID. 401. "Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

Texas Rule of Evidence 403 allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Further, the rule envisions exclusion of evidence only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009). When conducting a rule 403 analysis, courts must balance: (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate

the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Texas Rule of Evidence 404(b)(1) provides that evidence of an extraneous act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with this character." TEX. R. EVID. 404(b)(1); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *see also Rankin v. State*, 953 S.W.2d 740, 741 (Tex. Crim. App. 1996) (extraneous offense includes any act of misconduct, whether resulting in prosecution or not, that is not alleged in indictment). However, pursuant to rule 404(b)(2), such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2); *see also De La Paz*, 279 S.W.3d at 343 (rule 404(b) is "a rule of inclusion rather than exclusion" and excludes only evidence offered or used solely for purpose of proving bad character and conformity therewith). "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Devoe*, 354 S.W.3d at 469. A trial court's ruling respecting the admission of extraneous offense evidence is generally within the zone of reasonable disagreement if the extraneous offense evidence is relevant to a material, non-propensity issue and the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344.

Non-constitutional error that does not affect an appellant's substantial rights is to be disregarded. TEX. R. APP. P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927–28 (Tex. Crim. App. 2004). An appellant's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence

the verdict or had only a slight influence on the verdict. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *see also Garcia*, 126 S.W.3d at 927–28. In making this determination, we consider the entire record, including the other evidence admitted in the case, the nature of the evidence supporting the fact-finder's determination, the character of the alleged error and how it might be considered in connection with other evidence in the case, the State's theory, any defensive theories, closing arguments, and whether the State emphasized the error. *Motilla*, 78 S.W.3d at 355–56.

### C. Application of Law to Facts

### 1. Sufficiency of the Evidence

We begin with appellant's third issue, in which he contends the evidence is insufficient to support his conviction because "the State failed to prove a culpable mental state beyond a reasonable doubt." According to appellant, (1) although the evidence shows Efurd suffered serious bodily injury, "[i]t does not show that Appellant intentionally or knowingly caused that serious bodily injury," and (2) "[t]he State failed to prove the adverse outcome in Efurd's surgery was the result of anything other than poor surgical technique." Specifically, appellant argues (1) Efurd "signed a consent form for her surgery in which she acknowledged risks of adverse outcomes, which included some of the outcomes she experienced"; (2) although Henderson and Lazar testified that a trained neurosurgeon would know that the things that were done to Efurd would cause serious bodily injury, they "did not testify that *Appellant* knew they would cause serious bodily injury" (emphasis original); (3) both Henderson and Lazar were paid for reviews relating to civil litigation respecting this case; (4) several witnesses "agreed that Appellant had to have been distracted during Efurd's surgery because of what was happening in Brown's case"; (5) Smith testified that "whenever [appellant] tried to help a patient," "[h]e believed that he could"; and (6) Bagley testified there are less obvious ways to intentionally harm a patient other than in an

operating room in front of others, all of the adverse outcomes in appellant's patients were reported outcomes that have happened before to other surgeons, "the outcome in Efurd's case was a known complication that a poorly-trained inexperienced surgeon might encounter," performing additional surgery to try to repair damage could be a sign that appellant had some concern for his patients, and a "chaotic operating room" is "an additional barrier to providing appropriate care" when a surgeon is "inexperienced and poorly trained."

The State responds that the evidence of knowledge in this case fell into three categories: (1) "things that any neurosurgeon would know"; (2) "things that Appellant knew about his own prior surgeries"; and (3) "things that Appellant knew in the midst of Mary Efurd's surgery." According to the State, (1) "[t]he jury could reasonably infer that because Appellant was a neurosurgeon, he knew what any neurosurgeon would know"; (2) because the evidence showed appellant had caused serious bodily harm in multiple cases during the preceding months and "knew it," rational jurors could have inferred that appellant was "aware that his conduct in Efurd's surgery was reasonably certain to cause the same result"; and (3) because there was evidence that appellant was told during Efurd's surgery that the implant was malpositioned and the intraoperative x-rays showed the improper positioning, rational jurors could have inferred that appellant was aware he was reasonably certain to cause serious bodily injury to Efurd.

The record shows Henderson testified (1) there is not "any way that a neurosurgeon would not know that he was causing [Efurd] harm" and (2) the complication that occurred during Efurd's surgery is "extremely rare" and "unique." Lazar testified (1) it is "inconceivable" that there is "any way that a neurosurgeon doesn't know that he's going to cause Ms. Efurd serious bodily injury by doing these things"; (2) he has never "seen anything like what happened in Ms. Efurd's surgery"; and (3) the outcome of Efurd's surgery is "beyond egregious," not "a normal risk of surgery," and not something Efurd "would have consented to" when she signed surgical consent forms.

Additionally, (1) Hoyle stated that after his first and only surgery with appellant, he told appellant he "was incredibly dangerous" and Hoyle "was never working with him again" because "[h]e was going to hurt somebody"; (2) Passmore, Morguloff, Sample, and Rohr testified that during the months prior to Efurd's surgery, appellant was told he had caused serious injury to his patients; and (3) Kissenger, Padron, and Furey testified that during Efurd's surgery, appellant was told, and the intraoperative x-rays showed, that the implant was improperly positioned.

Further, Bagley's uncontroverted testimony included the following:

Q. These things don't just happen all the time, on a regular basis.

A. Yes, ma'am.

Q. So it's highly unusual that a surgeon would have all of these extremely-rare complications in a very short period of time. Wouldn't you agree?

A. Extremely. Yes, ma'am.

Q. And even a surgeon who wants to say they're poorly trained, when they—when a patient is complaining of new pain over and over and over again, multiple patients, you start to know that you're hurting people.

A. I would hope so. Yes, ma'am.

Accordingly, the record shows appellant experienced a highly unusual number of extremely rare complications over a very short period of time, i.e., from December 2011 through July 2012; was told multiple times during that period that he had caused serious injury to his patients; and was told during Efurd's surgery that the device he was installing was malpositioned. The jury was permitted to draw any reasonable inferences from the facts so long as each inference was supported by the evidence presented at trial. *Zuniga*, 551 S.W.3d at 733. Further, "[d]irect evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*. On this record, we conclude the evidence of what appellant knew prior to and during Efurd's surgery supports a reasonable inference that,

during Efurd's surgery, appellant was "aware that his conduct [was] reasonably certain to cause" serious bodily injury to Efurd. *See id.*; *see also* PENAL § 6.03(b). As indicated above, whether appellant was "aware" of the reasonable certainty of the result of his conduct is critical.

The dissent concludes the evidence is insufficient to sustain appellant's conviction for knowingly or intentionally causing serious bodily injury to Efurd. Specifically, the dissent states in part (1) the evidence supports the lesser culpable mental state of "recklessness" because "the jury could have concluded appellant . . . was aware that his incompetence posed a significant danger and chose, without justification, to engage in actions that threatened to bring about that danger"; (2) however, the State did not prove appellant "actually knew what he was doing was reasonably certain to result in injury," i.e., the culpable mental state of "knowingly"; and (3) "the proof shows all too clearly that appellant did not know what he was doing and that he was wholly lacking in the kind of self-awareness that would support a finding that, by operating on a patient, he knew he was 'reasonably certain' to do more harm than good." Further, the dissent states,

> [T]he evidence supports the conclusion that at the time he performed the surgery on the complainant, appellant was *aware*[3] of five complications out of an unknown total patient population, that he had been rebuked by another doctor who opined that "he was going to hurt somebody" at some point, and had been accused of causing injury to other patients in the past. This evidence speaks to what appellant, as a trained neurosurgeon, *should* have known about the risk he posed generally, as would any evidence of past deficient performance, but says nothing about the probability of harm to any particular patient, most importantly Ms. Efurd.
>     . . . That appellant had been accused of (or was being investigated for) errors causing injuries to patients in the past is clear as is the notion that neurosurgery as performed by him appeared to pose elevated risks, but the State made no effort to quantify that risk or to apply it to the crime for which he was charged. It did not ask Dr. Bagley, for example, whether he (Bagley) could have said that it was "reasonably certain" that appellant would harm Ms. Efurd or any particular patient. Instead, he simply agreed that he "would hope" that a surgeon who had experienced a series of rare complications would start to know that he was "hurting people" . . . .[4]

---

[3] Italics supplied.

[4] The testimony of Bagley on this point actually stated as follows:

In essence, the dissent concludes the evidence does not support an inference that appellant was aware that his conduct in question was reasonably certain to cause injury. In reaching that conclusion, the dissent focuses on appellant's "unknown total patient population" and the State's lack of "effort to quantify" the "probability of harm" to Efurd based on that total patient population. The record shows appellant strenuously objected in the trial court to the State's efforts to introduce a broad spectrum of evidence of other surgeries performed by him. Further, appellant did not assert any argument pertaining to "probability" based on "total patient population" until during oral submission before this Court the dissenting justice suggested those propositions. Moreover, as described above, the record contains uncontroverted expert testimony that during a very short period of time, appellant's surgical techniques resulted in extremely rare adverse outcomes with unusual frequency. To the extent the dissent posits that evidence of a "probability of harm" based on appellant's "total patient population" was essential to demonstrate the culpable mental state of knowingly in this case, we strongly disagree.

As described above, appellate review of the sufficiency of the evidence "does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Johnson*, 2018 WL 5810857, at *1; *see also Hooper*, 214 S.W.3d at 16 ("inference" is conclusion reached by considering other facts and deducing logical consequence from them). Further, we must not base our decision in this case on "policy" concerns focused upon hypotheticals and abstract applications.[5] Rather, we reach our

---

Q. And even a surgeon who wants to say they're poorly trained, when they—when a patient is complaining of new pain over and over and over again, multiple patients, you start to know that you're hurting people.

A. I would hope so. Yes, ma'am.

The jury was entitled to consider the whole of Bagley's testimony, not just the answer to the above question.

[5] We decline to address the dissent's policy discussion, as that discussion has no bearing on the application of the established law described above to the facts of this case. *See* TEX. R. APP. P. 47.1 (this Court is to hand down written opinion that is as brief as practicable); *see also City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 599 (Tex. 2018) (Guzman, J., concurring) (public policy arguments "are acutely legislative concerns and, as such, are constitutionally removed from judicial purview").

conclusion based on the combined and cumulative force of all the evidence described above and the proper deferential standard of review. *See Clayton*, 235 S.W.3d at 778. We respectfully disagree with the dissent's conclusion that the jury could not reasonably draw an inference that appellant was aware that his conduct in question was reasonably certain to cause serious bodily injury.

We decide appellant's third issue against him.

### 2. Admission of Extraneous Offense Evidence Respecting Other Surgeries

In his first issue, appellant contends the trial court abused its discretion by admitting extraneous offense evidence pertaining to appellant's surgeries on the other patients described above in violation of rule 404(b). Appellant asserts the trial court's improper admission of "voluminous amounts" of such evidence "resulted in an unfair trial where Appellant was forced to defend against unindicted allegations." Specifically, appellant argues in part,

> It seems the aim was to evoke outrage and sympathy from the jury in order to obtain a conviction. However, . . . [p]arading surgery after surgery in front of the jury in order to establish guilt in a single case is the very definition of evidence in conformity with bad character or criminal behavior. It is evidence which "is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him."
> . . . .
> The effect was that the prosecutor stressed evidence that was irrelevant and inadmissible pursuant to Rule 404(b) in order to scare and browbeat the jury into finding a culpable mental state for the charged offense where no evidence of one existed, or for the extraneous offenses, for that matter. . . . Appellant was harmed by the admission of this evidence because without it, the jury, by the State's own admission, had no other evidence of his alleged mental state.

(citations to authority omitted). Further, appellant asserts in his brief in this Court (1) "not to be forgotten is the larger impact of the State's conduct in prosecuting a case of this kind and arguing to the [trial court] that it should be allowed to present evidence of a surgeon's entire career to establish intent or absence of mistake to prove a mental state in a single surgery" and (2) "[t]he

floodgates will now be opened for all surgeons to have their entire career considered by lawyers . . . to decide whether those surgeons have committed a crime in performing their job."

The State responds that the trial court did not abuse its discretion by admitting the complained-of evidence. According to the State, the extraneous acts in question were (1) relevant to material, non-conformity issues because "[t]hey showed that Appellant was aware that his conduct was reasonably certain to cause serious bodily injury, and they disproved accident, mistake, and malpractice," and (2) "so probative of Appellant's culpable mental state that the danger of unfair prejudice could not have substantially outweighed it."

We begin by addressing the relevance of the complained-of evidence. The State contends (1) "[i]n Texas, extraneous acts have long been admissible to prove a culpable mental state when one cannot be inferred from the conduct alleged in the indictment" and (2) "[l]ikewise, if a defendant's conduct is capable of both an innocent and a criminal interpretation, extraneous offenses are relevant under the doctrine of chances to prove that the innocent explanation is less likely." Further, the State argues in part,

> If Appellant, while operating on Passmore, is told that he's dangerous and that he's going to hurt someone, and afterward, Passmore can no longer swim, run, or walk without limping, the jury would be willing to accept Appellant's poor surgical technique as a conceivable explanation. But if shortly afterwards a similar thing happens to Morguloff, and if on the third occasion Summers is paralyzed, the immediate inference (as a probability, perhaps not a certainty) is that Appellant deliberately caused the result, because the chances of inadvertent injuries on three successive similar occasions is extremely small.
>
> But here, it happens three more times:
>
> If, on the fourth occasion, Martin bleeds to death, and on the fifth occasion Brown dies of a stroke, the inference (perhaps not a certainty, but by now a presumption) is that Appellant deliberately caused the result.
>
> And if, on the occasion alleged in the indictment, Appellant amputates a nerve root, impales the dura with a screw, and leaves the interbody device in the psoas muscle, the immediate inference is that, at minimum, Appellant was aware that his conduct was reasonably certain to cause serious bodily injury.

"The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance." *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) (citing *De La Paz*, 279 S.W.3d at 347). For the doctrine to apply, there must be a similarity between the charged and extraneous offenses, since it is the improbability of a like result being repeated by mere chance that gives the extraneous offense probative weight. *See, e.g.*, *Beaty v. State*, No. 05-17-00287-CR, 2018 WL 3991283, at *6 (Tex. App.—Dallas Aug. 21, 2018, no pet.) (mem. op., not designated for publication). No rigid rules dictate what constitutes sufficient similarities. *Id*. An extremely high degree of similarity is not required where intent, as opposed to identity, is the material issue. *Id*.

In the case before us, the record shows (1) appellant's culpable mental state was a disputed element of the charged offense, (2) Efurd's surgery involved surgical procedures or techniques similar to those used in appellant's surgeries on the other patients described at trial, and (3) the outcomes of the surgeries described at trial were extremely rare. Under the doctrine of chances, the evidence of multiple similar rare events in the several months preceding Efurd's surgery tended to increase the likelihood that those events did not happen by chance and thus was relevant to the question of whether appellant's conduct fell within the culpable mental states pleaded by the State. *See De La Paz*, 279 S.W.3d at 348 ("extraordinary coincidence" that appellant saw drug deals that no one else did three different times "flies in the face of common sense" and therefore, under doctrine of chances, allowed jurors to conclude it was objectively unlikely that appellant was being truthful in his testimony respecting what he saw); *Vasquez v. State*, No. 03-15-00067-CR, 2017 WL 474064, at *4 (Tex. App.—Austin Jan. 31, 2017, no pet.) (mem. op., not designated for publication) (under doctrine of chances, fact that appellant who was accused of indecency by sexual contact with a student in his classroom committed similar sexual acts against another child in his classroom during same time frame made it considerably less probable that complainant had

fabricated her allegations). Accordingly, pursuant to that doctrine, the evidence in question did not lack relevance to a material, non-conformity issue.

Moreover, independently from the doctrine of chances, "an extraneous offense may be used to illustrate intent where it cannot be inferred from the act." *Jones v. State*, 716 S.W.2d 142, 161 (Tex. App.—Austin 1986, pet. ref'd). In the case before us, the extraneous offense evidence in question demonstrated knowledge by appellant that from December 2011 through July 2012, his surgical techniques resulted in extremely rare adverse outcomes with unusual frequency and caused serious injuries to his patients. That knowledge was relevant to the reasonableness of an inference respecting whether appellant was aware that continuing to perform surgery using those techniques was reasonably certain to cause adverse outcomes resulting in additional serious injuries, i.e., the culpable mental state of knowingly.[6] *See Davis v. State*, 955 S.W.2d 340, 348–49 (Tex. App.—Fort Worth 1997, pet. ref'd) (evidence of prior adverse outcomes respecting dental surgeon's other patients tended to establish dental surgeon "was aware of but consciously disregarded the risk" of using similar surgical technique on complainant patient and thus had culpable mental state of "recklessness"); *Jones*, 716 S.W.2d at 162 (in case of nurse convicted of murder of pediatric patient, evidence pertaining to adverse outcomes in nurse's treatment of other pediatric patients with similar symptoms was relevant because, although "natural causes would have been believable" as applied to one child, "looking at the same types of incidents that all happened within such a short time to six children makes that much less likely").

---

[6] In addition to his arguments described above, appellant asserted for the first time during oral submission before this Court that relevance for purposes of rule 404(b) could not be established without evidence of the total number of surgeries performed by him during his entire career and the percentage of adverse outcomes resulting from those surgeries overall. The record does not show appellant asserted that argument in the trial court. Further, that argument is inconsistent with appellant's arguments asserted in his brief before us. Appellant contends in his brief in this Court that a negative consequence of this case is "the larger impact of the State's conduct in prosecuting a case of this kind and arguing to the [trial court] that it should be allowed to present evidence of a surgeon's entire career to establish intent or absence of mistake to prove a mental state in a single surgery." Moreover, as described above, the relevance of the extraneous evidence in question was established by uncontroverted expert testimony that during a very short period of time, appellant's surgical techniques resulted in extremely rare adverse outcomes with unusual frequency. Appellant's overall percentage of adverse surgical outcomes based on his entire career is immaterial to that relevance. Therefore, we disagree with appellant's position asserted during oral submission that the State could not establish relevance of the evidence in question for purposes of rule 404(b) without showing appellant's overall percentage of adverse surgical outcomes based on his entire career.

Next, we address appellant's complaint respecting the "voluminous amount" of extraneous offense evidence. According to appellant, (1) "the evidence concerning the named complainant in this case constituted less than a day of trial while the extraneous offense evidence constituted the remaining twelve days of trial," (2) "[i]n other words, roughly ninety-two percent of the trial consisted of extraneous offense evidence," and (3) the State relied heavily on that evidence during opening statements and closing argument.

The State responds (1) appellant's calculation categorizes evidence pertaining to Brown's surgery as extraneous, but "Brown's surgery is best viewed as contextual rather than extraneous"; (2) to arrive at ninety-two percent, appellant must have also included evidence presented in the punishment phase of trial and hearings outside the jury's presence, rather than properly including only evidence presented to the jury during the "guilt phase" of trial; and (3) not counting evidence respecting Brown's surgery or any hearings outside the presence of the jury, "only 44% of the guilt-phase transcript covers extraneous matters." The State acknowledges that forty-four percent "is still a significant amount of time," but contends it "needed to prove a culpable mental state beyond a reasonable doubt, and to do that it had to prove extraneous surgeries beyond a reasonable doubt." Further, the State argues that "[e]ven if this factor weighs against the trial court's ruling, the other factors all support it," and "[t]his factor alone cannot overcome the presumption of admissibility, nor show an abuse of discretion."

As described above, factor number six of the balancing test to be applied by this Court in conducting a rule 403 analysis is "the likelihood that presentation of the evidence will consume an inordinate amount of time." *See Gigliobianco*, 210 S.W.3d at 641–42. We agree with the State's position that Brown's surgery provided context for the charged offense and therefore evidence respecting that surgery was not extraneous. *See Austin v. State*, 222 S.W.3d 801, 809 (Tex. App.— Houston [14th Dist.] 2007, pet. ref'd) (declining to consider contextual evidence for purposes of

–42–

rule 403 analysis). Further, appellant cites no authority, and we have found none, to support the inclusion of extraneous offense evidence presented during the punishment phase of trial in the rule 403 analysis in this case or to include hearings outside the presence of the jury in our analysis. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (providing guidelines for introduction of evidence of "bad acts" after finding of guilty); *Newton v. State*, 301 S.W.3d 315, 320–21 (Tex. App.—Waco 2009, pet. ref'd) (declining to consider portions of record outside presence of jury in conducting rule 403 analysis). Accordingly, the record shows that approximately forty-four percent of the guilt–innocence phase of trial was spent on evidence respecting extraneous acts of appellant. This was a substantial portion of trial and therefore factor number six of the balancing test weighs in favor of exclusion. *See Newton*, 301 S.W.3d at 321 (sixth factor weighed in favor of exclusion where extraneous offense evidence amounted to about thirty percent of testimony); *McGregor v. State*, 394 S.W.3d 90, 121 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (sixth factor weighed in favor of exclusion when approximately one-third of trial was spent developing extraneous testimony). However, that factor alone is not determinative, but rather must be balanced against the remaining factors. *See Gigliobianco*, 210 S.W.3d at 641–42.

The first and second factors to be considered are the inherent probative force of the proffered evidence and the proponent's need for that evidence. *See id*. As described above, the State needed the evidence in question to establish a disputed element, i.e., appellant's culpable mental state, and had no other means to establish that element. Thus, the trial court could have reasonably concluded the evidence in question was highly probative and the State's need for that evidence was considerable. *See Newton*, 301 S.W.3d at 320. Accordingly, both the first and second factors weigh heavily in favor of admissibility. *See id*.; *see also Sifuentes v. State*, 494 S.W.3d 806, 817 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (concluding first factor "weighs heavily" in

favor of admissibility where extraneous evidence cast doubt on appellant's claim that he lacked requisite intent or knowledge).

The third factor is any tendency of the evidence to suggest decision on an improper basis. *See Gigliobianco*, 210 S.W.3d at 641–42. As described above, the jury was repeatedly instructed throughout the trial that the extraneous offense evidence in question was to be considered "only . . . in determining the intent, knowledge, motive, absence of mistake or lack of action of the defendant, if any, alleged in the indictment in this case and for no other purpose." Also, the jury charge contained that same instruction. Therefore, this factor weighs in favor of admissibility. *See McGregor*, 394 S.W.3d at 121.

The fourth factor is "any tendency of the evidence to confuse or distract the jury from the main issues." *See Gigliobianco*, 210 S.W.3d at 641–42. As described above, all of the extraneous surgeries by appellant were, like Efurd's surgery, back surgeries that "would be considered low risk." Further, as described above, the jury was given multiple limiting instructions. However, the outcomes of several of the extraneous surgeries in question were extremely adverse. Therefore, this factor weighs in favor of exclusion. *See Newton*, 301 S.W.3d at 320.

Finally, the fifth factor is any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence. *See Gigliobianco*, 210 S.W.3d at 641–42. As described above, the witnesses at trial included several physicians who provided expert testimony. The record does not show the jury was not equipped to evaluate the probative force of the evidence. *See id*.

To summarize, two of the six factors to be considered weigh in favor of exclusion of the evidence in question and the remaining factors favor admissibility. Rule 403 envisions exclusion of evidence only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer*, 296 S.W.3d at 568. On this record, we conclude there

is not a "clear disparity" between the danger of unfair prejudice posed by the extraneous-offense evidence and its probative value. *See id*.; *see also McGregor*, 394 S.W.3d at 122 (concluding that although time spent developing extraneous offense evidence weighed against admissibility, trial court was within zone of reasonable disagreement in admitting evidence); *Newton*, 301 S.W.3d at 321–22 (concluding that although half of *Gigliobianco* factors, including factors four and six, weighed in favor of exclusion of extraneous offense evidence, there was no clear disparity between probative value and danger of unfair prejudice where State had considerable need for that evidence); *Austin*, 222 S.W.3d at 809 (concluding that while half of witnesses spent "significant time" testifying about matters in medical records respecting extraneous cases, other factors weighed in favor of admissibility of that extraneous evidence and therefore trial court did not abuse discretion by not excluding it). Accordingly, we conclude the trial court did not abuse its discretion by admitting the complained-of extraneous offense evidence respecting other surgeries by appellant.

We decide against appellant on his first issue.

### 3. Admission of State's Exhibit 160

In his second issue, appellant contends the trial court abused its discretion by admitting State's Exhibit 160, the December 9, 2011 email from appellant to Morgan described above, because it "constituted irrelevant, inadmissible extraneous offense evidence in violation of Texas Rules of Evidence 401, 403, and 404(b)." According to appellant, as to rule 401, the email in question (1) "was sent over seven months prior to the alleged offense in this case"; (2) "focuses largely on Appellant's relationship with Morgan"; (3) "is not relevant to show how [appellant] acted intentionally or knowingly in this case"; (4) does not mention surgery, Efurd or any other patient, or "what Appellant knew or intended during surgery"; and (5) is therefore "neither material nor probative; and thus, inadmissible."

Further, as to rule 403, appellant asserts,

> The [rule 403 balancing factors described above] weigh heavily in Appellant's favor because the email in question had no bearing on Efurd's surgery, definitely confused and distracted the jury from the main issue in the case, namely: Appellant's intent during Efurd's surgery and not some random comment to his girlfriend, and was clearly given undue weight when the prosecutor argued it, alone, proved Appellant's *mens rea* in this case during closing arguments to a jury which was unequipped to evaluate any probative value of the email. *See* [*Gigliobianco*, 210 S.W.3d at 640–41]. For the foregoing reasons, State's Exhibit 160 was irrelevant, and therefore, inadmissible.

Additionally, as to rule 404(b), appellant contends (1) the State "resorted to convicting Appellant by manipulating the jury to believe Appellant was, in fact, a 'stone cold killer' based on a random comment made in a private email to his girlfriend seven months prior to the alleged offense in this case which made no reference to the alleged victim"; (2) "[t]here can be no other reason for the State to offer State's Exhibit 160 other than to show action in conformity therewith and that he is a bad person in general because of the lack of the specificity of the statement in regards to the facts of this case"; and (3) appellant "was erroneously forced to defend himself against an extraneous bad act, a random comment in a private email, that was not included within the indictment or even tangentially connected to this case in any way." Finally, appellant asserts he "was harmed by the admission of this evidence because without it, the jury, *by the State's own admission*, had no other evidence of his alleged mental state." (emphasis original).

The State responds that the trial court did not abuse its discretion by admitting the email in question into evidence and, regardless, any error must be disregarded as harmless. Specifically, the State asserts in part (1) the relevancy standard is non-demanding and, in general, relevant evidence should not be excluded; (2) the email was relevant because it provided a "small nudge" toward intentional conduct and rebutted defensive theories advanced by appellant; (3) the danger of unfair prejudice did not substantially outweigh the email's probative value; (4) the email was admissible under rule 404(b) because it showed motive, intent, and plan, and did not show criminal

propensity; and (5) "any error in admitting the email was harmless, because it would have had no effect on the outcome."

As described above, "[e]vidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Stewart*, 129 S.W.3d at 96. Additionally, a person's mental state may be inferred from the person's acts, words, and conduct. *See Hart*, 89 S.W.3d at 64; *Martinez*, 833 S.W.2d at 196. In the case before us, the record shows (1) appellant's mental state was a fact of consequence at issue; (2) in the email in question, appellant stated on December 9, 2011, "I am ready to leave the love and kindness and goodness and patience that I mix with everything else that I am and become a cold blooded killer," and "[w]hat I am being is what I am, one of a kind, a mother [expletive] stone cold killer that can buy or own or steal or ruin or build whatever he wants"; and (3) the surgeries described at trial in which appellant caused serious injury to his patients occurred during the eight months following that email. On this record, we conclude it was not outside the zone of reasonable disagreement for the trial court to conclude that appellant's statements in that email provided at least "a small nudge" toward proving that appellant's acts in question were done intentionally or knowingly, or disproving that such acts were the result of happenstance. *See Stewart*, 129 S.W.3d at 96. Accordingly, we conclude the trial court did not abuse its discretion by concluding State's Exhibit 160 was relevant. *See* TEX. R. EVID. 401.

Further, as described above, appellant's arguments respecting violation of rules 403 and 404(b) both describe and rely on the alleged lack of relevance of the email in question. In light of our conclusion above that the trial court did not abuse its discretion by concluding State's Exhibit 160 was relevant, we disagree with appellant's positions respecting violation of rules 403 and 404(b).

Moreover, as to harm, an appellant's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the verdict or had only a slight influence on the verdict. *See Motilla*, 78 S.W.3d at 355; *Garcia*, 126 S.W.3d at 927–28. In response to appellant's contention that the jury had no evidence of his alleged mental state other than State's Exhibit 160, the State asserts in part,

> The email was evidence which, if given weight by the jury, supported an inference that Appellant intentionally caused serious bodily injury. But the State was not required to prove that to obtain the verdict it sought; proof that he knowingly caused serious bodily injury would suffice. And . . . there was abundant evidence that Appellant knowingly caused serious bodily injury. First, he knew—because any neurosurgeon would know—that malpositioning hardware and amputating nerve roots would cause serious bodily injury. Second, he knew that Passmore, Morguloff, Summers, Martin, and Brown had suffered serious bodily injury already. Third, he knew that Efurd's hardware was malpositioned because the intra-operative x-rays and his colleagues all told him so. The State was entitled to prove intentional conduct, but knowing conduct supported the jury's verdict. State's Exhibit 160 would have had little to no effect on the verdict, and was therefore harmless.

Based on the entire record before us, including the evidence described by the State in its argument set out above, we disagree with appellant's position that the jury had no evidence of his alleged mental state other than State's Exhibit 160. On this record, we conclude appellant was not harmed by the admission of the email in question. *See Motilla*, 78 S.W.3d at 355; *Garcia*, 126 S.W.3d at 927–28.

We decide appellant's second issue against him.

### III. CONCLUSION

We decide appellant's three issues against him. The trial court's judgment is affirmed.

|  | /Douglas S. Lang/ |
| --- | --- |
| Schenck, J., dissenting | DOUGLAS S. LANG |
|  | JUSTICE |

Publish
TEX. R. APP. P. 47.2(b)

170235F.P05

–48–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

CHRISTOPHER DANIEL DUNTSCH, Appellant

No. 05-17-00235-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5, Dallas County, Texas
Trial Court Cause No. F15-00411-L.
Opinion delivered by Justice Lang, Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 10th day of December, 2018.